**Brian KENDRICK, Appellant–
Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–1003–CR–300.**

Court of Appeals of Indiana.

May 26, 2011.

Rehearing Denied July 26, 2011.

---

Victoria L. Bailey, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Ian McLean, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Brian Kendrick appeals his convictions for class A felony Attempted Murder,[1] class B felony Robbery,[2] two counts of class C felony Feticide,[3] and class A misde-

---

1. Ind.Code Ann. § 35–42–1–1 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011); Ind.Code Ann. § 35–41–5–1 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011).

2. I.C. § 35–42–5–1 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011).

3. I.C. § 35–42–1–6 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011). In 2009, the Legislature amend-

meanor Carrying a Handgun Without a License.[4] Kendrick presents the following consolidated and restated issues for review:

1. Do Kendrick's convictions for attempted murder and two counts of feticide violate the double jeopardy clause in the Indiana Constitution, article 1, section 14?

2. Did the trial court abuse its discretion in finding one of the State's witnesses unavailable for trial and allowing his deposition to be read into evidence?

3. Did the State commit prosecutorial misconduct?

We affirm in part, reverse in part, and remand.

On the evening of April 21, 2008, Kendrick and Aaron Stewart came to Aaron Little's garage on the west side of Indianapolis for haircuts. Charles Petty, Little's best friend, was also present. The four men hung out for about an hour. During that time, Stewart and/or Kendrick made references to wanting to rob a bank. Kendrick had a black backpack with him with a Calico semi-automatic pistol inside, an uncommon gun that he had gotten from Stewart several months prior.

Stewart and Kendrick left that evening in Kendrick's blue Trailblazer. They agreed to commit a robbery together the following morning. Little was also apparently in on the robbery at some point. A number of phone calls were made early the next morning between Little and Stewart and Stewart and Kendrick. When Stewart and Kendrick arrived at Little's house that morning, Little refused to participate in the robbery, but he agreed to get a car for them to use. The three men drove together to a gas station where Little met one of his girlfriends, Twaunya Taylor, at about 7:45 to borrow her black Sebring.[5] After he dropped Taylor off at work, Little met Stewart and Kendrick back at his house. Kendrick took possession of the Sebring, and Stewart drove his Trailblazer.

On their way to the bank on the east side, Stewart and Kendrick stopped in a parking lot to solidify their plan for the robbery. The plan was for Stewart to park on the street and wait in his Trailblazer during the robbery. He was instructed to block (with his vehicle) anyone pursuing Kendrick, who was going to flee in the Sebring.

That morning, Katherine Shuffield was working as a teller at the Huntington Bank at 21st and Post Road in Indianapolis. There were three other employees present and one patron as Kendrick entered the bank armed with a Calico handgun. He wore a face mask, gloves, and dark clothing to avoid being identified. Kendrick ordered the patron to the floor. Then he attempted to open the gate to the teller area. When he could not open it, he jumped over Shuffield's counter. As the obviously-pregnant Shuffield backed away, Kendrick pointed his gun and shot her in the abdomen. Shuffield fell to the floor screaming for someone to help her and her twin babies.

Without responding to Shuffield's pleas for help, Kendrick moved onto the next two tellers, taking the contents of their

---

ed the statute to increase feticide to a class B felony. The offense was a class C felony, however, at the time of the instant offense.

**4.** Ind.Code Ann. § 35–47–2–1 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011).

**5.** Taylor did not know Kendrick at the time, but she identified him at trial as being the other man with Stewart and Little that morning.

cash drawers. He then jumped back over the counter and on his way out fired a shot in the direction of the patron still lying on the floor. Neither the patron nor any of the bank employees were able to identify the shooter.

Upon fleeing the bank, Kendrick ran to the Sebring and drove away, and Stewart drove the Trailblazer. They met at an abandoned house. When Stewart learned that Kendrick had shot someone, he went to his cousin's house to get new clothing for Kendrick. In the meantime, Kendrick opened the bag only to find that a dye-pack had exploded. Kendrick and Stewart eventually went together in the Trailblazer to Stewart's cousin's home.

After several frantic phone calls from Stewart, Little came later that morning to pick up the Sebring on the east side. While Stewart and Little drove from Stewart's cousin's home to the abandoned house, Stewart filled Little in on what had happened. After returning the Sebring to his girlfriend's garage, Little went to Petty's house. He watched the news coverage of the robbery and told Petty about the robbery and his involvement.

Shuffield was seriously injured as a result of the shooting. After two days of surgeries, she began having contractions such that the babies had to be delivered. They were only about twenty-two-weeks gestation. The first twin was stillborn and the second survived only a few hours after delivery.

Leads for the crime were running cold, so at the end of May the bank offered a reward. As a result, Petty provided information to police in early June and gave specific details not previously released to the media. Stewart and Kendrick were subsequently arrested, and upon his arrest, Stewart gave a statement to police implicating himself and Kendrick.

On June 23, 2008, the State charged Kendrick with class A felony attempted murder, class A felony robbery, two counts of class C felony feticide, and one class A misdemeanor weapons charge. Kendrick's five-day jury trial commenced on January 25, 2010. Among others, Little, Petty, and Stewart testified against Kendrick. The theory of the defense was that Kendrick had been set up and was not involved in the robbery.[6] The jury ultimately found Kendrick guilty as charged. The trial court entered judgments of conviction accordingly, except it reduced the robbery conviction to a class B felony to avoid double jeopardy. At the sentencing hearing on February 12, 2010, the trial court sentenced Kendrick to consecutive sentences of thirty years for attempted murder, fourteen years for robbery, four years for each feticide conviction, and one year on the handgun conviction. In all, Kendrick received an aggregate sentence of fifty-three years in prison. He now appeals. Additional facts will be provided below as necessary.

1.

■ Kendrick initially argues that his feticide convictions must be vacated pursuant to article 1, section 14 of the Indiana Constitution. Specifically, he contends that the State used the same evidence to establish both counts of feticide and the attempted murder count in violation of our state's prohibition against double jeopardy.

Our Supreme Court has established a two-part test for analyzing state double jeopardy claims. According to that test,

---

**6.** The defense theory relied heavily upon testimony from Gilberto Mendez, an eyewitness who reported seeing the robber run through Mendez's backyard and jump into the passenger seat of a vehicle. Mendez's description of the two vehicles involved conflicted with the State's evidence.

multiple offenses are the same offense in violation of article 1, section 14, "if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State,* 717 N.E.2d 32, 49 (Ind.1999). Kendrick raises his claim under the actual evidence test. Thus, we must determine whether there is a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of one offense may also have been used to establish all of the essential elements of the other offense. *See Davis v. State,* 770 N.E.2d 319 (Ind. 2002); *Bald v. State,* 766 N.E.2d 1170, 1172 (Ind.2002) ("the Indiana Double Jeopardy Clause is not violated when the evidentiary facts establishing the essential elements of one offense also establish only one or even several, *but not all,* of the essential elements of a second offense") (emphasis in original).

In the instant case, we find that the evidentiary facts used to establish the feticide convictions established all of the elements of the attempted murder conviction. Both convictions resulted from one act, the shooting of Shuffield in the stomach. To establish the feticide convictions, the State correctly observes that it was required to present additional evidence regarding Shuffield's pregnancy and the resulting termination thereof. *See* I.C. § 35–42–1–6 ("[a] person who knowingly or intentionally terminates a human pregnancy with an intention other than to produce a live birth or to remove a dead fetus commits feticide"). No additional evidence, however, was required or presented to establish the attempted murder.[7] Thus, there is more than a reasonable possibility that the evidentiary facts used by the jury to establish the essential elements of feticide may also have been used to establish all of the essential elements of attempted murder.[8]

Having vacated Kendrick's feticide convictions, we remand for resentencing on the remaining counts. *United States v. Rivera,* 327 F.3d 612, 614 (7th Cir.2003) ("where a defendant is sentenced on multiple counts, he has 'no legitimate expectation of finality in any discrete portion of the sentencing package after a partially successful appeal'") (quoting *United States v. Shue,* 825 F.2d 1111, 1115 (7th Cir.1987)), *cert. denied. See also Owens v. State,* 897 N.E.2d 537 (Ind.Ct.App.2008). In particular, the trial court may now consider the victim's pregnancy and the termination thereof in crafting Kendrick's sentence for attempted murder.[9] On remand, however, the court may not impose an aggregate sentence in excess of fifty-three

---

7. The State does not argue that each conviction involved a separate victim. To be sure, in a subsequent argument in its appellate brief, the State makes clear that the victim of feticide is the mother (the one whose pregnancy has been terminated). Had Kendrick been charged and convicted of the murder of viable fetuses, I.C. § 35–42–1–1(4), we would clearly be dealing with separate victims.

8. In 2009, our legislature resolved double jeopardy problems like the one presented in this case by adding Ind.Code Ann. § 35–50–2–16 (West, Westlaw through 2011 Pub. Laws approved & effective through 2/24/2011). This statute allows the State to seek an additional fixed term of imprisonment of between six and twenty years when the State can show beyond a reasonable doubt that the defendant, while committing or attempting to commit murder, caused the termination of a human pregnancy.

9. At the sentencing hearing, Kendrick specifically argued that the court could not aggravate his sentence for attempted murder based upon the loss of Shuffield's babies because "that's contained in the feticide charges." *Transcript* at 1469. The trial court is no longer so constrained.

years, as that would raise a presumption of vindictiveness. *See United States v. Rivera*, 327 F.3d 612.

### 2.

■ Kendrick contends that the trial court abused its discretion by finding Gilberto Mendez unavailable for trial and allowing his deposition [10] to be read into evidence. He asserts that Mendez's absence was procured by the State and therefore the trial court violated his right of confrontation under the Sixth Amendment to the United States Constitution by allowing the deposition in lieu of live testimony.

■ The decision whether to allow admission of prior recorded testimony is within the sound discretion of the trial court. *Garner v. State*, 777 N.E.2d 721 (Ind.2002). The constitutional right of confrontation, nevertheless, restricts the range of admissible hearsay. *Id.* In *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the Supreme Court held that in order for a witness's out-of-court testimonial statements, such as the deposition in the instant case, to be admissible against a criminal defendant, the witness must be unavailable and the defendant must have had a prior opportunity to cross-examine the witness. The sole issue in this case is whether Mendez was unavailable.

■ "A witness is unavailable for purposes of the Confrontation Clause requirement only if the prosecution has made a good faith effort to obtain the witness's presence at trial." *Garner v. State*, 777 N.E.2d at 724. The issue is not whether the witness was out-of-state at the time of trial, but whether the State made a good faith effort to obtain the absent witness's attendance at trial. *Garner v. State*, 777 N.E.2d 721. "Even if there is only a re-

mote possibility that an affirmative measure might produce the declarant at trial, the good faith obligation may demand effectuation. Reasonableness is the test that limits the extent of alternatives the State must exhaust." *Id.* at 724–25 (citation omitted).

As found by the trial court, Kendrick's argument that the State procured the witness's absence is without merit. The record establishes that Mendez was subpoenaed by Kendrick and the State the week before trial, which began on Monday, January 25, 2010. Around noon on Wednesday, January 27, one of the State's investigators, John Koss, went to Mendez's home to check on his availability for trial. Mendez informed Koss that he thought the State needed him at 1:00 that day. After calling and speaking with the deputy prosecutor, Koss informed Mendez that he was not needed that day and to standby at home Wednesday and Thursday. Koss told him to wait for a call when and if he was needed as a witness.

Shortly thereafter it was discovered that there was a communication glitch. The defense had requested Mendez's appearance at 1:00, not the State. Koss and the deputy prosecutor did not realize this when they told him he would not be needed yet. An investigator for the defense, Dan Bailey, called Mendez around 12:45 to make sure he was coming. Upon learning of the confusion, Bailey informed Mendez that Koss was with the prosecutor's office and did not represent the defense. Bailey told him that he would talk with the attorneys and would call him back.

Early Thursday morning the parties discovered that Mendez had left town and did not plan to be back until the following week. Mendez spoke with Bailey later that day and stated that it would be impos-

---

**10.** Mendez's deposition was taken by the defense.

sible for him to come back by Friday because he was working in Kentucky. Although Mendez indicated that he could be back by Saturday, the parties and the court agreed that was not desirable. On Friday morning Mendez gave conflicting information to the parties, first indicating that he could be in court by 3:00 p.m. and then stating that he could not make it back that day because he would lose money. Under the circumstances, the prosecution expressed concern that Mendez would even show up on Saturday morning if given the chance.

After multiple lengthy discussions and presentation of evidence on the matter, the trial court ruled as follows:

> I've wanted to finish this case today all week. Mr. Mendez has proven to be illusive for whatever reason. I heard your story, [defense counsel] but I also hear [sic] Mr. Koss' testimony that he told him to be on standby—that he wouldn't need him Wednesday. I do not want to bring the jury back a sixth day unless I absolutely have to and all indications up to right now were that we could get this trial in and I think the jury has an anticipation of getting this trial in today. Given these circumstances I'm gonna allow the deposition. I'm gonna find Mr. Mendez is not available. . . .

*Transcript* at 1107–08.

Despite unintentional miscommunication between the State and Mendez, the record reveals that the State made a good faith effort to obtain Mendez's presence at trial. Specifically, the State hand delivered the subpoena to Mendez's residence the week before the trial and then sent Koss out to Mendez's home on the Wednesday of trial to ensure his availability. Further, Koss directed Mendez to standby and wait for further instructions on Wednesday or Thursday. Despite this direct communication, as well as other communications with the defense, Mendez left the State by early Thursday morning. Although Mendez maintained contact with the parties over his cell phone, he refused to divulge the name of his employer and repeatedly complained about losing wages by being a witness. Under the circumstances, the trial court did not abuse its discretion in finding Mendez unavailable for trial.

Moreover, as Kendrick concedes, Mendez's deposition was not harmful to the defense. In fact, the deposition testimony was pivotal to the theory of defense and conflicted with aspects of the State's evidence.[11] Kendrick asserts, "Mendez' live testimony, which went to his credibility and the jury's evaluation thereof, was critical to Kendrick's case." *Appellant's Brief* at 20. Kendrick overlooks the fact that had he succeeded on his confrontation challenge the State would have been precluded from presenting any evidence via Mendez. In other words, the choice was not deposition versus live testimony; it was deposition versus no deposition. In the end, admission of the deposition was harmless beyond a reasonable doubt. *See Koenig v. State*, 933 N.E.2d 1271 (Ind. 2010) (alleged denials of the right to confrontation are subject to harmless-error analysis).

---

11. Mendez was a disinterested eyewitness whose identification of the vehicles involved in the crime differed from the other evidence presented in the State's case. Specifically, Mendez described to police, just after the crime, the suspect vehicles as a blue Honda Pilot and a brown or gray Dodge Intrepid. According to Kendrick, "[i]f the jury had believed Mendez over State's witnesses Little and Stewart, the jury could have reasonably concluded Kendrick was being set up by those individuals who testified against him." *Appellant's Brief* at 20.

### 3.

Finally, Kendrick argues that the prosecutor engaged in a pattern of misconduct that denied him his right to a fair trial. He claims the trial court abused its discretion in denying his multiple motions for mistrial based upon prosecutorial misconduct.

■ In reviewing a claim of prosecutorial misconduct, we determine whether the prosecutor engaged in misconduct, and if so, whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he should not have been subjected. *Cooper v. State*, 854 N.E.2d 831 (Ind.2006). The gravity of peril turns on the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct. *Id.* Absent clear error and resulting prejudice, a trial court's determination of violations and sanctions will be affirmed. *Overstreet v. State*, 783 N.E.2d 1140 (Ind.2003). *See also Donnegan v. State*, 809 N.E.2d 966, 972 (Ind.Ct.App. 2004) ("[w]e accord great deference to the trial court's decision, as it is in the best position to gauge the circumstances and the probable impact on the jury"), *trans. denied.* Moreover, a mistrial is "an extreme remedy warranted only when no other measure can remedy the situation." *Overstreet v. State*, 783 N.E.2d at 1155.

■ Kendrick argues initially that the State committed prosecutorial misconduct when its agent, Koss, told Mendez, a subpoenaed defense witness, that he did not have to come to court at 1:00 on Wednesday, January 27, and that he should stand by at home on Wednesday and Thursday until notified otherwise. Kendrick claims this communication caused Mendez to be an unavailable witness for both the State and the defense on Friday, January 29.

Kendrick's argument ignores what happened between this obviously unintentional miscommunication and Friday, the day Mendez was actually needed at trial. The record reveals that within an hour of speaking with Koss on Wednesday, Mendez spoke with Bailey, an investigator for the defense. Upon discovering the confusion, Bailey immediately communicated to Mendez that Koss was not from the public defender's office. Further, as in previous communications, Bailey made clear that he (Bailey) represented the defense. Bailey told Mendez that he would talk with the defense attorneys and get back with him. When Bailey called Mendez that evening, he could not get through. Early the next morning Bailey spoke with Mendez and learned that he had left the State and that it would be impossible to be back by Friday. This was in violation of the directions Mendez had received from both Koss and Bailey. Specifically, Koss had informed Mendez to standby on Thursday as well as Wednesday, and Bailey had made clear that the defense would need him independently of the State.[12]

In sum, the record indicates that Mendez took it upon himself to head back to work in Kentucky upon not being called to testify by Wednesday. Whether Mendez misunderstood or not, it is clear that the parties had communicated to him that he should remain available for trial on Thursday. The initial miscommunication between Mendez and Koss did not cause Mendez to absent himself from the state

---

12. Koss testified that in a phone conversation with Mendez on the first day of trial Koss informed Mendez that he would not be needed by the defense on Tuesday, as set forth in the subpoena, but more likely on Thursday.

Mendez complained that he had already taken Tuesday off work. In other conversations with the parties, Mendez made clear that he worked out of town and that he was losing money each day that he did not work.

on Thursday with no plans to return for the duration of the trial.

Kendrick also argues that the deputy prosecutor disparaged defense counsel on multiple occasions in front of the jury. We will address each challenged comment in turn, as well as the cumulative effect they may have had.

■■■ Kendrick first points to a clearly improper comment that the deputy prosecutor made in response to a dubious objection asserted by the defense. Specifically, the deputy prosecutor stated, "that sounds like slick lawyering to me". *Transcript* at 324. Defense counsel did not timely object, and when he did address the statement later outside the jury's presences, counsel stated, "maybe admonishing the jury's too far but I—but I just don't want to go there. I just think that's—it doesn't help the case." *Id.* at 333. The deputy prosecutor apologized to counsel and the court, and the parties then proceeded to address other issues. Under the circumstances, we find that the objection was not properly preserved. *Reynolds v. State,* 797 N.E.2d 864, 868 (Ind.Ct.App.2003) ("defendant waives appellate review of the issue of prosecutorial misconduct when he fails to immediately object, request an admonishment, and then move for a mistrial"). Moreover, the passing comment, although clearly improper, did not place the defendant in a position of grave peril or have a probable persuasive effect on the jury.

■■■ Kendrick next complains about the following exchange, which occurred when Kendrick was cross-examining Little at relative length regarding his familiarity with prison living conditions:

Q. Okay. All right. Now, let's talk for just a minute about that DOC time in that small cell—

[State]: Judge—

Q. —because if—

[State]:—show my continuing objection and I can't imagine how we—how this can be relevant or how this isn't a violation of what the—the decision you made earlier.

[Defense]: Judge, I can make it relevant really quickly if you'll just let me ask my next question.

[State]: Judge, you've already asked him not to go any farther. We're talking about toilets. We're talking about walls.

[Defense]: Judge, I'm gonna move for a mistrial at this point because of prosecutorial misconduct. I'm trying to conduct cross-examination.

THE COURT: All right. We'll go into recess.

*Transcript* at 462–63.[13]

Outside the presence of jury the trial court indicated that it did not believe defense counsel had violated the order in limine but then stated to defense counsel, "I don't know where you are going now and I don't know why you need to make the comment concerning prosecutorial misconduct in front of the jury to be perfectly candid about it." *Id.* at 463. Defense counsel explained his objection to the State's conduct as follows:

[W]hen I proceeded to ask [Little] questions which attacked his credibility [the deputy prosecutor] continued to object to the same question over and over again and I don't have any other recourse but to say I believe he's inten-

---

**13.** The State's challenge to this portion of cross-examination was based upon an order in limine, which prohibited the parties from inquiring into a witness's prison terms. The order and its application to Little's testimony had been the subject of a lengthy bench conference before he took the stand.

tionally trying to obstruct my cross-examination. I haven't heard an objection that goes to me violating anything the Court has ruled.

*Id.* at 464. After the prosecutor explained his objections more fully, the court indicated that it would admonish the jury to disregard defense counsel's reference to prosecutorial misconduct. The court further stated, "I don't think there was any prosecutorial misconduct or intent to commit the same." *Id.* at 468.

Our review of the record reveals that Kendrick is raising a different ground on appeal to support his claim of prosecutorial misconduct, which he cannot do. Specifically, on appeal, he argues that the prosecutor's comments "served no purpose but to impugn defense counsel's credibility and convey to the jury that defense counsel was somehow violating an order of the trial court." *Appellant's Brief* at 27. This is different from his objection below that the prosecutor was repeatedly objecting in order to obstruct the cross-examination. Regardless, Kendrick has not established prosecutorial misconduct in this regard.

 Finally, Kendrick challenges a comment made during closing argument. Remarking on the strength of the State's case, the deputy prosecutor stated: "[defense counsel] has to somehow make you believe that this [was] all concocted and there was this other car and the police are trying to keep that away from you and that everybody's—". *Transcript* at 1336 (argument cut off by defense objection). Kendrick claims this comment "informed the jury that defense counsel was perform-

ing a slight of hand, pulling a fast one". *Appellant's Brief* at 28. We do not agree, and we fail to see how this one remark during a lengthy closing argument could have placed Kendrick in grave peril. *See Etienne v. State,* 716 N.E.2d 457, 462 (Ind. 1999) ("most of the State's allegedly improper comments during closing argument were fair characterizations of the State's view of the evidence and were only a small part of a lengthy closing argument at the end of a five-day trial"). Moreover, defense counsel did not request an admonishment or a mistrial with respect to this claimed instance of prosecutorial misconduct. Therefore, the issue is waived. *Reynolds v. State,* 797 N.E.2d 864.

The three challenged statements, which occurred during Kendrick's five-day jury trial, did not individually or cumulatively amount to prosecutorial misconduct entitling him to a new trial. Contrary to Kendrick's assertions, any misconduct was isolated and did not constitute "a pattern of conduct that denied Kendrick a fair trial." *Appellant's Brief* at 29.

We affirm in part, reverse in part, and remand for resentencing in light of the vacated feticide convictions.

MAY, J., and MATHIAS, J., concur.