**FOR PUBLICATION**



FILED

May 09 2012, 8:44 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICIA CARESS MCMATH**
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| HALSTON THOMAS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1109-CR-830 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Patricia Gifford, Senior Judge
The Honorable Robert Altice, Jr., Judge
Cause No. 49G02-1104-MR-24426

**May 9, 2012**

**OPINION - FOR PUBLICATION**

**FRIEDLANDER, Judge**

Halston Thomas appeals his conviction of Murder,[1] a felony, and Carrying a Handgun Without a License,[2] a class A misdemeanor. Thomas presents the following restated issue for review: Did the trial court err in admitting deposition testimony of a witness who refused to testify at trial and whom Thomas had an opportunity to examine at the deposition?

We affirm.

The facts favorable to the conviction are that late in the morning of November 9, 2009, Andre Drake was visiting a friend, Temia Crossley, who lived in a second-floor apartment in an apartment building located at 6387 Terrance Drive in Indianapolis. Drake's vehicle, with stickers on the trunk prominently displaying the identifying words "dre day", was parked in front of the building. *Transcript* at 27. As the two started to leave, Drake ran into another friend, Channing Gordon, at the top of the stairs and the two exchanged phone numbers. While Drake and Gordon spoke, three men, including Thomas and Lamar Hall, entered the apartment building's first-floor main entrance. Thomas and Drake had been in an altercation several months before. Gordon knew Thomas as "Noodles." Crossley, who was standing near the door when the men entered, saw that Thomas was carrying a handgun. She immediately ran upstairs to her apartment and went inside.

Gordon saw Thomas climb the stairs, pointing a handgun at Drake. Gordon knocked on the door of Apartment C, which was also located on the second floor, and went inside. He

[1]  Ind. Code Ann. § 35-42-1-1 (West, Westlaw through end of 2011 1st Regular Sess.).
[2]  Ind. Code Ann. § 35-47-2-1 (West, Westlaw through end of 2011 1st Regular Sess.).

heard the barrel of Thomas's gun spinning just before he went inside Apartment C, the one beside Crossley's. Seconds later, once inside their respective apartments, Crossley and Gordon heard essentially the same thing concerning the ensuing encounter between Drake and Thomas. Crossley heard Drake say, "Man take everything you want." *Transcript* at 55. Gordon heard Drake "yell", "you can have it all." *Id*. at 107. Both heard the sound of a struggle and then both heard multiple gunshots. Crossley thought she heard ten or eleven shots, while Gordon thought he heard three or four. Seconds later, Drake knocked on Crossley's door and she let him inside. He told her he had been shot in the chest and asked her to call 911. Drake entered the apartment and collapsed on the living room floor. He gave Crossley a .40-caliber handgun he had been carrying and asked her to hide it, which she did by putting it in her closet.

Drake was shot four times – twice in the arm and twice in the back. One of the shots in the back lacerated his kidney, severed his aorta, and passed through his liver and diaphragm. This shot proved to be fatal to Drake. Ultimately, police recovered three bullets from Drake's body and two from the apartment hallway. All five bullets were .32 caliber. Police interviewed Crossley, who told them she had seen one of the men before, several days earlier at the Speedway store where she worked. Police viewed a store surveillance videotape with Crossley and she identified a man as the one she thought had accompanied the man who held the handgun on the day Drake was shot. That man turned out to be Hall. Detective Mark Prater interviewed Hall, who eventually told him that the man who shot Drake in the apartment building was called "Noodles." He then informed the detective that

3

Noodles's name was Halston Thomas.[3]

Detective Prater subsequently interviewed Thomas. Thomas admitted shooting Drake, but claimed he did so in self-defense and then blacked out. On April 12, 2011, Thomas was charged with murder and carrying a handgun without a license. In June 2011, Jade Stone was incarcerated in Marion County on a charge of conspiracy to commit robbery, a class A felony. At that time, she approached Detective Prater and told him she had information concerning the Drake shooting. According to Stone, she knew Thomas as "Beefy." In March 2011, she had been involved in a conversation with Thomas, Tiana Cathy, and Briscoe Jones. She heard Thomas tell Jones "[t]hat he had killed somebody and that he was looking for the witness on the case that testified against him to kill him." *Id.* at 168. According to Stone, Thomas identified the witness in question by what he drove – an older model, "tealish-blue Camaro, two door." *Id.* That car was later connected to Hall.

Thomas was tried on the above charges before a jury. Gordon was called to testify, but refused to do so despite a court order and despite being found in contempt of court for failing to testify. Thomas testified on his own behalf. His description of the incident differed significantly from the trial testimony of Crossley and the deposition testimony of Gordon. According to Thomas, he was unarmed when he entered the apartment building and encountered Drake. Drake, on the other hand, was armed with two revolvers, one bigger than the other. According to Thomas, Drake pulled out the smaller gun and pointed it at Thomas,

---

[3]   At trial, Hall recanted all of the information he had provided to Detective Prater during the interview, claiming he was lying to the detective for his own best interests.

which precipitated a struggle, during which Thomas wrested control of the gun from Drake. As Drake reached for the bigger revolver and ran up the stairs, Thomas fired the gun he was holding, striking Drake as set out previously. Thomas claimed that, at the time he fired the shots at Drake, Drake was standing at the top of the stairs and Thomas was standing at the bottom. The jury found Thomas guilty as charged. Further facts will be provided where relevant.

When Gordon refused to testify at trial, the trial court granted the State's request to read Gordon's deposition testimony into evidence. Thomas contends that, in so doing, the trial court deprived him of his constitutional right to confront the witnesses against him because he did not have an adequate opportunity to confront and cross-examine Gordon. "The decision whether to allow admission of prior recorded testimony is within the sound discretion of the trial court." *Kendrick v. State*, 947 N.E.2d 509, 515 (Ind. Ct. App. 2011), *trans. denied, cert. denied,* 2012 WL 113503 (U.S. Mar. 19, 2012) (citing *Garner v. State,* 777 N.E.2d 721 (Ind. 2002)).

Thomas's argument rests chiefly upon our Supreme Court's decision in *Howard v. State*, 853 N.E.2d 461 (Ind. 2006). In *Howard*, the defendant was tried on child molesting charges. The alleged victim, who was twelve years old at the time of trial, became upset after answering a few preliminary questions and then refused to answer any more questions, including any questions of substance concerning the alleged molestations. The court tried several times, without success, to determine how it could alleviate the witness's reluctance to testify further. Failing that, the trial court declared the witness unavailable and, over defense objection, granted the State's request to admit the child's pretrial deposition testimony into

5

evidence. The defendant appealed to this court, which affirmed his conviction. Our Supreme Court granted transfer. Although the Supreme Court ultimately determined that the trial court erred in admitting the deposition, its discussion leads us to the opposite conclusion with respect to Gordon's deposition.

In addressing the admissibility of the alleged victim's deposition in *Howard*, the Court noted the requirement set out by the United States Supreme Court that "if testimonial evidence is at issue, then 'the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.'" *Id.* at 465 (quoting *Crawford v. Washington,* 541 U.S. 36, 68 (2004)).

Thomas characterizes the deposition of Gordon as a discovery deposition, not a testimonial deposition, and therefore impliedly argues that *Crawford* does not apply. According to Thomas, a discovery deposition, unlike a testimonial deposition, "does not give the defendant an *adequate* opportunity for cross-examination of the witness because the case is in the discovery stage and defense counsel may not yet have all the available information to conduct an effective cross-examination." *Appellant's Brief* at 5. Our Supreme Court addressed a similar argument in *Howard*. We first note the Court's observation that "witness statements made during depositions are generally understood and widely recognized as testimonial." *Howard v. State*, 853 N.E.2d at 465. Nevertheless, noting that "*Crawford* provides no guidance concerning what 'opportunity' is sufficient to satisfy the demands of the Sixth Amendment," the Court acknowledged that litigators often divide depositions into two categories: discovery and testimonial. *Howard v. State*, 853 N.E.2d at 469. It also acknowledged that the motivation for taking a deposition for discovery purposes might differ

from that of a testimonial deposition. The Court, however, seemed disinclined to resolve the question by undertaking an analysis that resulted in placing the deposition in one category or the other. Instead, the Court made two observations that guided its inquiry into whether the deposition in question was admitted consistent with the *Crawford* standard.

First, the Court described the deposition in *Howard* as "a vigorous and lengthy examination" that "lasted approximately two hours and resulted in ninety-two typewritten pages[.]" *Id*. at 469. The Supreme Court cited these facts to support its rejection of Howard's claim that he had been denied his right of confrontation. Thomas would have us interpret the Supreme Court's language in doing so as reflecting its view that depositions that are not similarly long and involved will not satisfy the requirement that the deposition be testimonial. We reject this interpretation for reasons that will be explained below. Thomas next contrasts the lengthy deposition conducted in *Howard* with the one conducted in the present case, where his "counsel specifically limited the deposition to discovery matters and did not conduct an extensive cross-examination to "'cast doubt on the credibility' of Gordon. Read into the transcript, the deposition is only 25 pages long and the questions asked by defense counsel were directed at what Gordon knew about the case." *Appellant's Brief* at 5. Therefore, the argument goes, because the deposition of Gordon was not as vigorous and lengthy as the one in *Howard*, the *Crawford* requirements were not met.

At this point, Thomas segues into a discussion of the most facially important of the *Crawford* elements, i.e., the opportunity to confront the witness during the deposition. Thomas contends he did not have an opportunity to confront Gordon at Gordon's deposition because the scope of defense counsel's questioning of Gordon was strictly limited – by

7

Gordon's counsel. Thomas contends, "Thomas' counsel specifically limited the deposition to discovery matters and did not conduct an extensive cross-examination to 'cast doubt on the credibility' of Gordon." *Id.* In fact, at the very outset of the deposition, counsel explained his intentions in that regard:

> Mr. Gordon, we're here for a discovery deposition today. What that means is this isn't intended to replace you coming to trial, if there is a trial on this matter and testifying in front of a jury. Does that make sense?

> \* \* \* \* \* \*

> [A]ll right because this is a discovery deposition there are specifically some subject areas that I'm not going to cover. Also, the style and manner of the questioning would be different if this was intended to replace you testifying in Court. Does that make sense?

> \* \* \* \* \*

> [M]y client, Halston Thomas is not here today and he's not waiving his right to have – to confront cross-examine witnesses or to have a face-to-face meeting with the witnesses against him, okay.

*Transcript* at 100-101. Clearly, counsel did not intend to question Gordon vigorously or in depth. This is not to say, however, that counsel did not have the *opportunity* to do so. The restrictions placed upon the scope, tenor, and purpose of the deposition were self-imposed and not dictated by law. Our reading of *Howard* leads us to conclude that the critical inquiry centers upon whether the opportunity was presented, not whether it was seized.

We return here to the conclusion left unexplained above, i.e., the mere fact that a deposition was not as vigorous and lengthy as the one before the Court in *Howard* does not

8

foreclose the possibility that it will be classified as testimonial[4] in nature and, as such, admissible if it meets the criteria set out in *Crawford*. After observing that the deposition in *Howard* was, in fact, vigorous and lengthy, and did not support a claim that the defendant did not have an opportunity to confront the witness in that setting, the Court stated:

> Second, *and perhaps more importantly*, *Crawford* speaks only in terms of the "opportunity" for adequate cross-examination. The right of confrontation under the Sixth Amendment is honored where "the defense is given a full and fair opportunity to probe and expose [testimonial] infirmities [such as forgetfulness, confusion, or evasion] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Maryland v. Craig,* 497 U.S. 836, 847, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). Whether, how, and to what extent the opportunity for cross-examination is used is within the control of the defendant. … Only where a defendant has never had the opportunity to confront and cross-examine a witness does the admission of prior testimony at a subsequent proceeding violate the constitutional right of confrontation.

*Howard v. State*, 853 N.E.2d at 470 (emphasis supplied). This language reflects that opportunity is the critical inquiry. Thomas's counsel had the opportunity to conduct a thorough and vigorous questioning of Gordon, but for unexplained reasons chose to limit its scope to something less than that. Notwithstanding those self-imposed strictures, the opportunity was there and thus *Crawford* was satisfied. We therefore conclude that the State established that Gordon was unavailable to testify at trial, and that Thomas had an opportunity to cross-examine Gordon at the deposition, which was testimonial in nature. *See*

---

[4] We also observe that it is not relevant that counsel classified the deposition of Gordon as a discovery deposition.

*Crawford v. Washington*, 541 U.S. 36.

Finally, we observe that even assuming that *Crawford's* requirements were not met, any error in admitting the deposition was harmless. "[A] denial of the right of confrontation is harmless error where the evidence supporting the conviction is so convincing that a jury could not have found otherwise." *Jackson v. State*, 735 N.E.2d 1146, 1152 (Ind. 2000). There is no question about Thomas's identity as the shooter, because he admitted shooting Drake. The case turned upon whether the jury would believe Thomas's claim that he acted in self-defense. The jury would have to believe Thomas's account of the occurrence in several key respects, including: (1) Thomas's claim that he arrived at the scene unarmed, (2) Drake initiated the confrontation by pulling a gun and pointing it at Thomas's face, (3) Thomas wrested control of that gun from Drake, and (3) Thomas shot Drake while Thomas was at or near the bottom of the stairs and Drake was at the top of the stairs and attempting to pull another gun from his pocket.

Crossley testified that when Thomas entered the building she was at the bottom of the stairs leading up to the second floor and saw a gun in Thomas's pocket. At the moment Thomas and his companions entered the building, Gordon and Drake were talking to each other near the top of the aforementioned staircase. When she saw the gun, Crossley ran up the stairs past Drake and Gordon and into her apartment. Once inside her apartment, Crossley heard the sounds of a scuffle and heard Drake say "Man, take everything you want" at about the same time multiple gunshots rang out. *Transcript* at 55.

The key points of difference between her account and Thomas's include her testimony that Thomas was already armed when he showed up at the scene, that the incident started

10

with Drake upstairs and Thomas downstairs, and that Drake's statement just before the shooting started was consistent with his desire to placate Thomas and to forestall Thomas's aggression. Gordon's testimony was consistent with Crossley's, adding only that he saw Thomas pull the gun out of his pocket and point it at Drake's chest or abdomen. At that point Gordon ran into a nearby apartment. Thus, Gordon's deposition testimony merely duplicated Crossley's in nearly all respects. Moreover, the forensic evidence showed that the bullets that entered Drake's back reflected either a downward trajectory or a slightly upward trajectory. This was entirely inconsistent with Thomas's account that he was eight to ten feet below Drake when he fired the fatal shots. Rather, it is consistent with the view that the shooting occurred at or near the top of the stairs and that Thomas would have had to climb the stairs to reach Drake's location in order to get there in the few seconds after Crossley left the scene.

In view of the strength of the evidence of guilt and in view of the fact that Gordon's deposition testimony was, largely, merely cumulative of Crossley's, even assuming for the sake of argument that the trial court erred in admitting Gordon's deposition, the error was harmless.

Judgment affirmed.

MAY, J., and BARNES, J., concur.