

ATTORNEY FOR APPELLANT

Joseph P. Hunter
Quirk and Hunter, P.C.
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Alexandria Sons
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Kevoszia Winston, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | March 27, 2023 <br><br> Court of Appeals Case No. <br> 22A-CR-1455 <br><br> Appeal from the Delaware Circuit Court <br><br> The Honorable Thomas A. Cannon, Jr., Judge <br><br> Trial Court Cause No. <br> 18C05-2001-MR-1 |

**Opinion by Judge Bradford**
Judges May and Mathias concur.

**Bradford, Judge.**

# Case Summary

[1] Kevoszia Winston visited the apartment shared by Jesse Ross, Bryon Rhodes, and Seth Barton to buy marijuana. Later that day, Winston and Dimorrea Benning returned to the apartment. Keeping Ross and Rhodes at gunpoint in the living room, Winston and Benning took money, drugs, and guns from the apartment. As they left, Winston fatally shot Barton, who had been sleeping in a recliner. The State charged Winston with murder, felony murder, and Level 2 felony robbery resulting in serious bodily injury. After Winston's first jury trial was declared a mistrial, the trial court conducted a second jury trial. The jury found Winston guilty as charged. The trial court merged the murder verdicts, entered judgment of conviction for murder and Level 5 felony robbery, and sentenced Winston to an aggregate term of fifty-eight years of incarceration. Winston appeals, arguing that the trial court erred by finding a witness, who had testified at his first trial, unavailable to testify and admitting the witness's prior testimony. We affirm.

# Facts and Procedural History

[2] On the morning of January 9, 2020, Winston visited Ross, Rhodes, and Barton at their Muncie apartment to buy marijuana. The transaction proceeded without incident, and Winston left the apartment. Rhodes went back to sleep in his room while Ross and Barton continued sleeping in the living room.

[3] Some time later, Ross awoke to Winston, armed with a handgun, "going through a pair of jeans" while "crawling" on the floor next to where Barton was sleeping. Tr. Vol. II pp. 203, 228. Benning then brought Rhodes out of his bedroom at gunpoint and sat him on the couch with Ross. Winston "put his boot on [Barton's] face and shoved him" to wake him up, but Barton kept sleeping. Tr. Vol. II p. 208.

[4] Winston and Benning demanded money and drugs. They grabbed a backpack that contained marijuana and cash and took four handguns. As Winston and Benning prepared to leave, Winston tripped over his shoelaces and fell, causing Rhodes to laugh. Winston stood up and then shot Barton in the chest as he slept in the recliner. After the neighbors had called 911, police arrived and administered first aid to Barton to no avail.

[5] On January 15, 2020, the State charged Winston with murder, felony murder, and Level 2 felony robbery resulting in serious bodily injury. The case proceeded to a jury trial; however, the trial court declared a mistrial on March 30, 2021, due to the prosecutor's illness. During this trial, Rhodes had testified that Winston had shot Barton and that he had wanted money and drugs. On April 18, 2022, a second jury trial began. At the second trial, Ross testified that Winston had demanded money and drugs and had shot Barton.

[6] The State and Winston subpoenaed Rhodes to testify at the second trial. At trial, the State informed the trial court that it had sent "multiple subpoenas out to all the addresses we have on file for [Rhodes]." Tr. Vol. III p. 89. The State

served Rhodes through an attorney that had been appointed to represent him in an unrelated criminal matter. Additionally, the State had "attempted multiple times to try to reach Mr. Rhodes by telephone[,]" but eventually had learned that that telephone number had been disconnected. Tr. Vol. II p. 89. The State had also sent officers to Rhodes's last known addresses on "multiple occasions[,]" including the morning the second trial started. Tr. Vol. II p. 89. Rhodes's attorney indicated that he also had been "unable to make contact with Mr. Rhodes." Tr. Vol. III p. 90. As a result, the State asked the trial court to find that Rhodes was unavailable for trial and admit his testimony from the first trial. Over Winston's objection, the trial court admitted Rhodes's prior testimony, finding that "the State ha[d] met its burden of showing a diligent effort" to procure Rhodes's presence at trial and that Winston had had an opportunity to cross-examine him at the first trial. Tr. Vol. III p. 92.

[7] At the conclusion of the second trial, the jury found Winston guilty as charged. The trial court merged the murder verdicts, entered judgment of conviction for murder and Level 5 felony robbery, and sentenced Winston to an aggregate term of fifty-eight years of incarceration.

## Discussion and Decision

[8] Winston argues that the trial court erred in finding that Rhodes was unavailable to testify and admitting Rhodes's prior testimony. Generally, "the admission and exclusion of evidence rests within the sound discretion of the trial court, and we review [that decision] only for an abuse of discretion." *Griffith v. State*,

31 N.E.3d 965, 969 (Ind. 2015) (citing *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002)).  However, when the issue is one of constitutional law, as is the case here, we review that claim de novo.  *Jones v. State*, 982 N.E.2d 417, 421–22 (Ind. Ct. App. 2013), *trans. denied*.  While the Confrontation Clause generally prohibits the admission of an out-of-court witness's testimony, the United States Supreme Court has carved an important exception out of that rule.  *See Crawford v. Washington*, 541 U.S. 36, 42 (2004).  Where a witness is unavailable for trial, and the opposing party had the opportunity to cross-examine the witness at a prior trial or proceeding, the Confrontation Clause will not bar the admission of that witness's prior testimony.  *Id*. at 57.  A "witness is unavailable for purposes of the Confrontation Clause requirement only if the prosecution has made a good faith effort to obtain the witness's presence at trial[.]"  *Garner v. State*, 777 N.E.2d 721, 724–25 (Ind. 2002).  "Reasonableness is the test that limits the extent of alternatives the State must exhaust."  *Id.*

[9]  To start, Winston argues that, because the State presented no evidence regarding Rhodes's availability besides what the State represented to the trial court, he was denied his fundamental right to confront a witness against him.  Notably, Winston concedes that he had the opportunity to cross-examine Rhodes at the first trial.  Despite that concession, however, Winston argues that the trial court's finding that Rhodes was unavailable "was error" and his conviction "should be reversed."  Appellant's Br. p. 13.  We disagree.

[10]  For its part, the State argues that its efforts in procuring Rhodes's attendance at trial were reasonable.  In *Berkman v. State*, 976 N.E.2d 68, 76 (Ind. Ct. App.

2012), *trans. denied*, "the prosecutor indicated" to the trial court that the State "had unsuccessfully attempted to serve [the defendant] with a subpoena" and "had been unable to contact [the defendant] via telephone." Under these circumstances, we concluded that the State had made a good-faith, reasonable effort to secure the defendant's presence at trial. *Id.* In Winston's case, the State sent "multiple subpoenas out to all the addresses" it had for Rhodes, including to Rhodes's attorney in an unrelated criminal matter. Tr. Vol. III p. 89. Moreover, the State attempted to contact Rhodes numerous times at a telephone number that had been previously used to contact him, but that had since become disconnected. The State also sent officers to Rhodes's last-known addresses and his parents' address on multiple occasions. Put simply, the State's efforts were even more thorough than its efforts in *Berkman*. As a result, we have little trouble concluding that the State made a good-faith, reasonable effort to procure Rhodes's presence at trial.

[11] Additionally, the State continued to try to locate Rhodes even until the morning of the second trial. In the hours preceding trial, the State "had officers trying to locate [Rhodes] at those addresses." Tr. Vol. III p. 90. We have previously held that such efforts to locate a witness on the day of trial, coupled with similar efforts prior to trial, constitute a good-faith, reasonable effort by the State to procure a witness. *See Davis v. State*, 13 N.E.3d 939, 946 (Ind. Ct. App. 2014), *trans. denied*.

[12] In arguing that the State failed to present evidence establishing Rhodes's unavailability, Winston relies on *Kendrick v. State*, 947 N.E.2d 509, 516 (Ind. Ct.

App. 2011), *trans. denied*. In that case, an investigator testified regarding the State's attempts to procure a witness for trial. *Id.* at 516. Winston's reliance on *Kendrick*, however, is misguided. We do not read that case to impose any testimonial requirement on the State to detail its efforts to procure an unavailable witness. The State's conduct here is no less sufficient than its conduct in *Berkman* or *Davis*. In *Berkman*, "the prosecutor indicated" the State's efforts to the trial court and we, accepting that as sufficient, admitted the absent witness's prior testimony. *Id.* at 72. Likewise, in *Davis*, the "State [had] made a record to the trial court" of its efforts and we found that sufficient to conclude that the State's efforts were reasonable. *Id.* at 943. Here, the State explained its efforts to the trial court after it had moved to admit Rhodes's prior testimony. We cannot say that approach is insufficient to show that Rhodes was an unavailable witness.

[13] Furthermore, even if we assume, *arguendo*, that the trial court erred in finding that Rhodes had been unavailable, that would have been a harmless error because Rhodes's prior testimony was cumulative of Ross's testimony. *See Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) (holding that the "improper admission of evidence is harmless error when the erroneously admitted evidence is merely cumulative of other evidence before the trier of fact."), *trans. denied*. As Rhodes did in the first trial, Ross testified in the second trial that Winston had shot Barton as he left the apartment after the robbery. Because of this cumulative evidence, any error in the admission of Rhodes's prior testimony was harmless. In short, we conclude that the trial court

properly admitted Rhodes's prior testimony because of the State's good-faith, reasonable efforts to procure his presence at the second trial and Winston's opportunity to cross-examine him at the first trial.

[14] The judgment of the trial court is affirmed.

May, J., and Mathias, J., concur.